3ORIGINAL

Law Offices of Beles & Beles
Robert J. Beles Bar no. 41993
Paul McCarthy Bar no. 139497
One Kaiser Plaza, Suite 2300
Oakland, California 94612-3642
Tel No. (510) 836-0100
Fax. No. (510) 832-3690

Attorneys for *Petitioner*
*RICARDO JESUS RAMIREZ*

## United States District Court
### Central District of California
--- Courthouse

RICARDO JESUS RAMIREZ,

     *Petitioner*,

  vs.

WARREN L. MONTGOMERY, Warden,
Calipatria State Prison, Calipatria, California,

     *Respondent*.

PEOPLE OF THE STATE OF CALIFORNIA,

     *Real Party in Interest*.

No. 5:22-cv-00083

PETITION FOR WRIT OF HABEAS
CORPUS; VERIFICATION;
MEMORANDUM OF POINTS AND
AUTHORITIES; EXHIBITS "A" AND "B"

**PETITION FOR WRIT OF HABEAS CORPUS**

**VERIFICATION**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**EXHIBITS "A" AND "B"**

3ORIGINAL

# TABLE OF CONTENTS

*item*                                                                      *page no.*

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

PETITION FOR WRIT OF HABEAS CORPUS. . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    1. Statement of custody and jurisdiction.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-1

    2. Statement of facts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-2

        a. Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-2

        b. The Alexander shooting.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-3

        c. The Moreno shooting.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-8

        d. Gang evidence... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-10

        e. Evidence related to Albert's firearm... . . . . . . . . . . . . . . . . . . . . .  p-15

        f. Petitioner's firearm possession.. . . . . . . . . . . . . . . . . . . . . . . . . .  p-17

    3. Claims for relief... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-17

    4. Prayer for relief.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-18

VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  p-18

MEMORANDUM OF POINTS AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . .  m-1

    1. Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

    2. Petitioner was denied his Fourteenth Amendment right to due process when the trial court refused to sever his trial from co-defendant Albert Ramirez, who was charged with the much more serious additional crimes murder and attempted murder, charges not filed against petitioner.. . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

        a. Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-1

        b. The joint trial resulted in the joinder of a weak case with a strong case, which induced the jury to convict petitioner because of prejudicial association with Albert.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-2

        c. The joinder resulted in the admission of highly prejudicial, otherwise inadmissible evidence against petitioner in violation of his Fourteenth Amendment right to due process... . . . . . . . . . . . . . . . . . . . . . . . . .  m-6

3ORIGINAL

*item*                                                                                                  *page no.*

   3. Petitioner was denied his Fourteenth Amendment right to due process when he was convicted of dissuading a witness based on constitutionally insufficient evidence... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-8

      a. Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-8

      b. There was insufficient evidence that petitioner dissuaded or attempted to dissuade Hurst from being a witness to a crime... . . . . . . . . . . . . . . . . .  m-9

   4. Petitioner was denied his Fourteenth Amendment right to due process when he was convicted of dissuading a witness under section 136.1, when the only witness that evidence suggested petitioner may have dissuaded was an accomplice to the crime about which the witness could testify.. . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-11

   5. Petitioner was denied his Fourteenth Amendment right to due process when there was constitutionally insufficient evidence that petitioner aided and abetted Albert in dissuading a witness.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-12

   6. Conclusion.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  m-14

EXHIBITS "A" AND "B". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  following

3ORIGINAL

# TABLE OF AUTHORITIES

*cases*                                                                 *page no.*

*Abbott v. Wainwright,* 616 F.2d 889 (5th Cir. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-2

*Barefoot v. Estelle,* 463 U.S. 880 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

*Bean v. Calderon,* 163 F.3d 1073 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . .   m-3

*Bird v. Wainwright,* 428 F.2d 1017 (5th Cir. 1970). . . . . . . . . . . . . . . . . . . . . . . . . . .   m-2

*Greene v. Fisher,* 565 U.S. 34 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

*Griffith v. Kentucky,* 479 U.S. 314 (1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-2

*Jackson v. Virginia* (1979) 443 U.S. 307 . . . . . . . . . . . . . . . . . . . . . . .   m-8, m-10, m-13

*Johnson v. Louisiana,* 406 U.S. 356 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-8

*Martinez v. Borg* 937 F.2d 422 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-12

*People v. Aranda* (1965) 63 Cal.2d 518. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-1

*People v. Beeman* (1984) 35 Cal.3d 547. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-12

*People v. Biehler* (1961) 198 Cal.App.2d 290. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-2

*People v. Chambers* (1964) 231 Cal.App.2d 23. . . . . . . . . . . . . . . . . . . . . . .   m-2, m-6

*People v. Cooper* (1991) 53 Cal.3d 1158. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-13

*People v. Ford* (1983) 145 Cal.App.3d 985. . . . . . . . . . . . . . . . . . . . . . . . .   m-9, m-10

*People v. Galvez* (2011) 195 Cal.App.4th 1253. . . . . . . . . . . . . . . . . . . . . . . . . . .   m-11

*People v. Joiner* (2000) 84 Cal.App.4th 946. . . . . . . . . . . . . . . . . . . . . . .   m-12, m-13

*People v. Jones* (1998) 67 Cal.App.4th 724 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-9

*People v. Kirvin* (2014) 231 Cal.App.4th 1507. . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-13

*People v. Massie* (1967) 66 Cal.2d 899 . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-2, m-7

*People v. Montoya* (1994) 7 Cal. 4th 1027. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-12

*People v. Reeder* (1978) 82 Cal.App.3d 543. . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-7

*Smith v. Kelso,* 863 F.2d 1564 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . .   m-2

*United States v. Angwin,* 271 F.3d 786 (9th Cir. 2001). . . . . . . . . . . . . . . . . . . . . .   m-7

*United States v. Lane,* 474 U.S. 438 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-3

3ORIGINAL

*cases*                                                                                  *page no.*

*United States v. Tootick,* 952 F.2d 1078 (9th Cir. 1991). . . . . . . . . . . . . . . . . . . . . .   m-2, m-7

*Williams v. Superior Court* (1984) 36 Cal.3d 441. . . . . . . . . . . . . . . . . . . . . . . . . .   m-2

*Williams v. Taylor*, 529 U.S. 362 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-1


*statutes*                                                                               *page no.*

28 U.S.C. section 2241(c)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-1

28 U.S.C. section 2241(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-1

28 U.S.C. section 2244(d)(1)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-2

28 U.S.C. section 2254(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-1

Penal Code section 136.1. . . . . . . . . . . . . . . . . . . . . . . . .   p-1, p-18, m-5, m-9, m-11-13

Penal Code section 136.1(c)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-9

Penal Code section 136(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-11

Penal Code section 186.22(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Penal Code section 288.7(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Penal Code section 29800(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Penal Code section 667(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Penal Code section 667(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Penal Code section 667(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Penal Code section 1098. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-1

Penal Code section 1170.12(c).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Supreme Court Rule 13.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1

Supreme Court Rule 13.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   p-1, p-2

United States Constitution,
Fourteenth Amendment. . . . . . . . . . . . . . . . . . . . . p-17, p-18, m-1, m-2, m-6, m-8, m-10-12

United States Constitution, Sixth Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-7

Vehicle Code section 10802.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-13

3ORIGINAL

*jury instructions*                                                                                           page no.

CALCRIM 2622. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   m-9

Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

United States District Court
Central District of California
--- Courthouse

| | |
|---|---|
| RICARDO JESUS RAMIREZ, | No. 5:22-cv-00083 |
| *Petitioner*, | PETITION FOR WRIT OF HABEAS CORPUS |
| vs. | |
| WARREN L. MONTGOMERY, Warden, Calipatria State Prison, Calipatria, California, | |
| *Respondent.* | |
| PEOPLE OF THE STATE OF CALIFORNIA, | |
| *Real Party in Interest.* | |

**PETITION FOR WRIT OF HABEAS CORPUS**

Comes now petitioner, Ricardo Jesus Ramirez, CDC no. AV6417, by and through counsel undersigned, and petitions for a writ of habeas corpus.

**1. Statement of custody and jurisdiction.**

1. On March 16, 2018, in the Riverside County Superior Court, petitioner was convicted of dissuading a witness (Penal Code section 136.1), participation in a criminal street gang (Penal Code section 186.22(a)), and unlawful possession of a firearm (Penal Code section 29800(a)(1).) Petitioner was also found to have committed a prior serious offense (Penal Code section 667(a)), and a prior strike offense, (Penal Code sections 667(c) and (e) and 1170.12(c).) Petitioner was sentenced to 23 years to life in state prison. (6 RT 1102-1103; 3 CT 709-712.)

2. Petitioner pursued a timely direct appeal. The California Supreme Court denied review on October 14, 2020.

3. Petitioner's direct review would normally have become final on January 12, 2021, the date of expiration of the 90 day time limit for filing a certiorari petition. Supreme Court Rules 13.1 and 13.3, *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) (process of direct review of a federal question includes the right to petition the Supreme Court for a writ of certiorari, and when this comes to an end, the underlying conviction becomes final), *Greene v. Fisher*, 565 U.S.

3ORIGINAL

34, 39 (2011), citing *Griffith v. Kentucky*, 479 U.S. 314, 321, n.6 (1987) ("Finality occurs when direct state appeals have been exhausted and a petition for writ of certiorari from this Court has become time barred or has been disposed of.") However, on March 19, 2020, the U.S. Supreme Court extended the filing date for all certiorari petitions from 90 to 150 days under Rules 13.1 and 13.3 due to "ongoing public health concerns relating to COVID-19." On July 19, 2021, the U.S. Supreme Court rescinded its March 19, 2020 order, but also ordered that "in any case in which the relevant lower court judgment, order denying discretionary review, or order denying a timely petition for rehearing was issued prior to July 19, 2021, the deadline to file a petition for a writ of certiorari remains extended to 150 days from the date of that judgment or order." (Orders attached as Exhibits A and B). Since the California Supreme Court's denial of the petition for review occurred during the "COVID period" between March 19, 2020, and July 19, 2021, the Supreme Court's 150 day extended time for filing a certiorari petition applied and petitioner's direct appeal became final on March 13, 2021, 150 days after the California Supreme Court denied review.

4. This petition is being filed within a year after petitioner's direct appeal became final and is thereby timely under 28 U.S.C. section 2244(d)(1)(A).

5. Petitioner is currently serving his sentence Calipatria State Prison, Calipatria, California, in the physical custody of Respondent, Warren L. Montgomery, Warden.

## 2. Statement of facts.

### a. Introduction.

6. The underlying incidents took place in Hemet, California, within Riverside County. Petitioner was tried with a co-defendant, Albert Martinez, who was charged with the same offenses as petitioner, plus the additional crimes of murder, attempted murder, and his own unlawful possession of a firearm. (1 CT 67-68.)

7. The prosecution's main eyewitnesses were Adam Hurst and Paul Alexander. Alexander claimed significant memory loss due to the trauma of being shot and the death of his wife, and his preliminary hearing testimony was read to the jury.

8. Three other prosecution witnesses refused to testify –- Amanda Rico, April Rodriguez, Cristoval Valenzuela. (2 RT 215-216, 367-368.))

### b. The Alexander shooting.

9. Hurst was in custody serving a 2 year sentence for a felony conviction. (1 RT 152, 249.) Hurst pled guilty to felony elder abuse in 2015, identity theft in February 2017, and misdemeanor financial elder abuse in August of 2017. (1 RT 152.) Hurst was also facing a pending charge of identity theft, which he had just learned about on the day he testified. (1 RT 153.) Hurst didn't know if the testimony in petitioner's case would affect his sentence in the pending case. (2 RT 250.) Hurst's convictions involved financial elder abuse, identity theft and stealing money. (2 RT 250.) Hurst testified under a grant of immunity. (1 RT 104-105.)

10. On April 21, 2015, Hurst was living with his brother and aunt and their family. (1 RT 155.) Hurst was a heavy drug user and had a heroin problem. (2 RT 251.) Hurst lived next to a man named "Whisper" with whom he used to smoke marijuana and methamphetamine. (1 RT 158.)

11. On April 21, Hurst asked "Whisper" to get him a bag of methamphetamine. (1 RT 159.) "Whisper" took Hurst to a white SUV. (1 RT 160, Exh. 66.) The driver of the SUV was named "Chico", and had a tattoo on the top of his head. (1 RT 163, 168.) The passenger was called "Happy," and was clean cut with a "comb over." (1 RT 164, 168.) Hurst identified Albert as "Chico", and petitioner as "Happy". (1 RT 173.) A fat lady with face tattoos sat in the back seat. (1 RT 164.) Hurst had never met any of these people before. (1 RT 169.)

12. Hurst purchased $20 worth of methamphetamine and smoked it in the SUV with all the occupants. (1 RT 165.) Hurst sat in the backseat behind the driver and "Whisper" sat behind the passenger. (1 RT 165.) After smoking the methamphetamine, "Whisper" appeared uncomfortable and got out of the SUV. (1 RT 166-167.) Albert and petitioner got out of the SUV and beat up "Whisper", while Hurst remained in the car. (1 RT 168, 174.) In his interview with police, Hurst stated that only Albert hit "Whisper", but petitioner didn't. (2 RT 247.) "Whisper" ran off, then looked back to say, "What the hell, Chico?" (2 RT 287.)

3ORIGINAL

13. Albert and petitioner got back in the SUV without "Whisper", and drove to Mary Henley Park on Kirby Street, continuing to smoke methamphetamine. (1 RT 176.) At this point, it was about 2:00 or 3:00 in the morning. (1 RT 181.) According to Hurst, Albert and petitioner were discussing committing "licks" or thefts. (1 RT 177.) The car ultimately stopped into a driveway of a house on Cypress Street. (1 RT 178.)

14. A green truck pulled up attempting to enter the driveway, so Albert pulled out and drove away. (1 RT 179.)    The green truck followed the SUV down Cypress, and pulled up alongside after Albert pulled over. (1 RT 181.) The driver of the green truck (Alexander) asked Albert why he had parked in his driveway. (1 RT 181.) Albert told petitioner to "give him 20." (1 RT 182.) Albert then shot the driver of the truck with a sawed-off shotgun before speeding off. (1 RT 183, 185.) Hurst identified the gun used to shoot the driver as a rifle, not a shotgun. (1 RT 183-184, Exh. 36, 37.) Hurst told police that petitioner told Albert "Don't kill him," Before the shooting. (2 RT 263.) Hurst denied handing Albert the gun he used to commit the shooting. (2 RT 264.) Albert pulled the firearm from the side of the door. (2 RT 284.)

15. After the shooting, Albert drove to Hurst's house on Oleander Street, a block or two away from where the shooting occurred. (2 RT 265.) It took only about a minute to drive there. (2 RT 265.) As they drove back towards Hurst's house, Albert asked Hurst whether he was cool, which Hurst interpreted as an attempt to "keep an eye" on him. (1 RT 187-188.) Albert told Hurst that he if talked to the cops, Albert would kill him. (1 RT 188.) Hurst felt threatened and intimidated by the comment. (1 RT 189.) Hurst could not recall whether petitioner said anything about Albert. (1 RT 189.)

16. The prosecutor refreshed Hurst's recollection with the statement he gave to police on April 21, 2015. (2 RT 218.) According to his interview, Albert told Hurst "Don't play me," and "I'll kill you for real. I'll kill you, dude. Don't fuck with me." (2 RT 219.) According to that same statement, petitioner then said, "if he thinks someone is going to go to the cops, that he'll kill 'em." (2 RT 219.) Hurst took that statement to mean both that petitioner and Albert would kill him if he spoke to police. (2 RT 220.)

3ORIGINAL

17. At the preliminary hearing, Hurst testified that no one was talking on the drive from the shooting to his house. (2 RT 266.) At that hearing, Hurst also testified that he didn't remember petitioner "saying anything in particular." (2 RT 267.) When asked at the preliminary hearing whether petitioner said that Albert would kill him if he spoke to the cops, Hurst replied that he remembered "them saying something about them just knowing people. (2 RT 268.) At trial, Hurst testified about the exact language used by Albert. (2 RT 269.) Hurst believed that petitioner's statement referred to both Albert and petitioner. (2 RT 272.) But at the preliminary hearing, Hurst could not remember petitioner saying anything. (2 RT 273.)

18. After the shooting, Hurst felt that he was in danger because he felt like he could be killed. (2 RT 220-221.) Hurst said that it was "not a good thing" to be a witness in a case from Hemet because it puts one's life in danger. (2 RT 221.)

19. After returning to Hurst's house, petitioner, Albert and the female passenger went into Hurst's garage with him. (2 RT 222-223.) Albert was still holding the firearm, which had a blue rag tied around it. (2 RT 224.) After about an hour, petitioner and Albert left the garage. (2 RT 226.) In his statement to police on April 21, Hurst told police that petitioner and Albert remained in the car outside his house but never came inside. (2 RT 233.) After Hurst stated that he told police that petitioner and Albert came into his house, the parties stipulated that Hurst never told police. (2 RT 234.)

20. Albert and petitioner left Hurst's house around 6:00 am. The police detained Hurst around 9:00 pm. (2 RT 236.) During that 15 hour period, Hurst was not at home and was "just around" with his brother. (2 RT 237.) Hurst walked to a donut shop and stayed for "just a while." (2 RT 237.) Hurst had a cell phone but didn't call the police to report the shooting. (2 RT 236-237.) Aside from the donut shop, Hurst want to "like, little, like spots, hangout spots," which he described as "hideaways." (2 RT 238.)

21. At around 9:00 pm, Hurst spoke with police after he was accused of stealing a TV from his aunt's home. (2 RT 227, 239.) Before he spoke with police, the woman who had been in the white SUV called to ask where he was. (2 RT 229.) During his interview, Hurst told police

3ORIGINAL

that the woman in the SUV had stolen the TV. (2 RT 252.)

22. Hurst told police that in the white SUV, he smoked a cigarette while the other passengers smoked marijuana. (2 RT 241.) Hurst testified, however, that they were really smoking methamphetamine. (2 RT 241.) Hurst began the interview talking about the stolen TV, but testified that he told the police on the street about the shooting. (2 RT 243.) Hurst didn't sleep from the time he smoked the methamphetamine at 1:00 am and when he spoke to the police at 9:00 pm. (2 RT 245.)

23. Hurst stated that at some point when he was in the white SUV, petitioner and Albert claimed that they were in a gang. (2 RT 253-254.) Albert said, "I'm from SSC." (2 RT 254.) Hurst didn't tell police that the occupants of the car claimed to be gang members. (2 RT 258.) No one in the white SUV asked Hurst if he was in a gang. (2 RT 261.)

24. Hurst testified that he had never sold drugs. (2 RT 275.) Hurst then identified his Facebook page which included the following posts: "Who's looking for Xanax? Hook me up ASAP;" and "Norco 10s. Got em, who need em? Hook me up ASAP." (2 RT 275-276.) Another post stated, "Hit me up. Got norcs for sale. Entire script of 60 must go. White Watson 10 milligrams. $5 a pill." (2 RT 276.) A third post said "[Hit me up] if you lookin for norcs, percs, all that. I got em…" (2 RT 277.) However, Hurst denied being a drug dealer. (2 RT 276.) Hurst said that if someone responded to one of his posts to purchase the pills,he would not have accepted their money. (2 RT 277.)

25. Alexander stated that he was testifying against his will, but was not scared to testify. (2 RT 343, 346.) Alexander was shot in the arm in April of 2015, but that he didn't remember much about the night. (2 RT 343.) Throughout his testimony, Alexander stated that he could not remember the night of the shooting because he had suffered serious trauma. (2 RT 349.) Alexander also testified that the loss of his wife affected his memory. (2 RT 354.)

26. In April of 2015, he was living at 2782 Cypress in Hemet. (2 RT 348.) Alexander was in his truck when he was shot, but didn't remember whether the person who shot him was in a car or on foot. (2 RT 349.) Alexander didn't know if he was afraid of gangs or even knowing

3ORIGINAL

what a criminal street gang was. (2 RT 353, 355.)

27. The prosecutor read Alexander's preliminary hearing transcript into the record. (4 RT 621.) Alexander testified that on April 21, 2015, he returned to his home at 2782 Cypress Street at around 2:30 am. (4 RT 621, 623.) A white Explorer SUV began to follow him home around the intersection of Kirby and Acacia. (4 RT 622.) Alexander didn't first encounter the Explorer parked in his driveway as he told police. (4 RT 636.) The Explorer pulled up next to him at a stoplight and a person in the Explorer was staring at him. (4 RT 637.) When he went to pull into his house, the Explorer pulled in front of Alexander and stopped. (4 RT 622.)

28. The Explorer then drove away before circling back and driving past Alexander's house again. (4 RT 623.) Alexander called 911 when he was stopped in front of his house because he thought the people in the Explorer were going to steal his son's car. (4 RT 641.) Alexander followed the car to see what was happening and then was shot near the intersection of Cypress and Kirby. (4 RT 623.)

29. Alexander pulled up next to the driver's side of the Explorer, about 6 feet away, and rolled down his passenger window. (4 RT 624, 642.) Alexander asked the occupants of the Explorer why they were following him, and was shot in response. (4 RT 625.) Alexander was shot by the driver with a "shortened" gun. (4 RT 625.) Bullets went through Alexander's arm and chest. (4 RT 626.) Alexander returned to his home after he was shot and then spent a week in the hospital. (4 RT 626, 628.)

30. Alexander described the shooter as having a head tattoo of the letter "S" or a snake, and identified Albert as the shooter. (4 RT 628-629.) There were two or three other people in the Explorer. Alexander also identified petitioner as being in the passenger seat. (4 RT 629-630.)

31. Someone handed a gun from the Explorer's back seat to the driver. (4 RT 643.) Alexander said it was easy for him to see the shotgun passed from someone in the backseat up to the driver. (4 RT 648.) Alexander put his car in reverse as soon as he saw the gun. (4 RT 644.) Alexander returned home and loaded his 12 gauge shotgun. (4 RT 645.) Alexander stated that he never actually found the shotgun he had at his house. (4 RT 645.) Alexander denied ever

3ORIGINAL

having the shotgun in his car. (4 RT 647.)

32. Investigator Douglas Klinzing examined Alexander's car and found the passenger window open and the driver's side window broken. (3 RT 516.) There was blood leading from the walkway of Alexander's house into the kitchen. (3 RT 516-517.) Alexander's sweatshirt had numerous holes across the chest where it had been grazed by a bullet. (3 RT 517.)

33. Klinzing interviewed Hurst on April 21, 2015. (3 RT 518.) Hurst reported that Albert told him, "'You're cool. Right?' and then he said, 'Don't play me. I'll kill you.'" (3 RT 519.) Hurst reported that petitioner then told him, "Hey, if he thinks somebody's going to talk to the cops, he'll kill him." (3 RT 520.) Hurst also reported a phone call he received from the number 951-426-1487, also on the day of the shooting. (3 RT 521.)

34. Police were called to Hurst's house because some items had been stolen, and Hurst approached an officer and said that he had information on a shooting. (3 RT 527.) Hurst didn't tell Klizning that he purchased and smoked methamphetamine in the early morning of the 21st. (3 RT 528.) Hurst described seeing a sawed-off shotgun in the car. (3 RT 529.) Hurst also described the gun as a "pirate gun." (3 RT 533.) Hurst first contacted officers at his house around 9:00 pm. (3 RT 534.) Hurst's interview was initially focused on the accusation that he had stolen his aunt's television. (3 RT 535.) Hurst described Albert as the kind of guy you would not want to mess with. (3 RT 535.)

36. Hurst denied using any drugs inside the SUV. (3 RT 535.) Klinzing confirmed that, according to Hurst, it was Albert who first stated that he would kill Hurst if he went to the police, and then petitioner who stated that Albert was the kind of guy who would kill someone if they spoke to police. (3 RT 537.) Hurst never said that petitioner personally threatened to hurt him. (3 RT 537.)

**c. The Moreno shooting.**

37. The jury also heard about the shooting death of John Moreno. Only Albert was charged in Moreno's death.

38. The parties stipulated that on April 20, 2015, Christopher Facundo was driving on

Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

Oakland Avenue, and saw what appeared to be a dead body on the side of the road. (3 RT 378.) Also, Angela Lannon was also driving an ambulance in Hemet at around 10:09 pm when she saw a dead body on the side of the road on Oakland Avenue. (3 RT 394.) Lannon asked another ambulance to collect the body. (3 RT 397.)

39. On April 20, paramedic Kenneth Cardin received a dispatch about a dead body on the side of the road at Oakland and State Street. (3 RT 401.) Cardin collected Moreno's body and saw many bullet holes in it (3 RT 404), but no weapons near it. (3 RT 407.) Cardin pronounced Moreno dead at 10:36 pm. (3 RT 408.)

40. Paramedic Paul Haynie received a report at about 10:00 pm about a body lying on the street. (3 RT 412-413.) When Haynie got there, he found that Moreno wasn't breathing and didn't have a pulse. (3 RT 413.)

41. Officer Anthony Datil went to to Oakland Avenue and State Street to investigate a report of a body. (3 RT 420.) When he arrived at the scene, he found a man lying on his back. (3 RT 421.) The man had a lighter in his hand, but no weapon. (3 RT 421-422.) A Del Taco cup was also located in the middle of the street. (3 RT 424.)

42. Dr. Allison Hunt performed the autopsy and determined that Moreno's cause of death was a gunshot wound to his chest. (4 RT 663-664.)

43. Investigator David Purcell interviewed Albert in the early morning hours of April 25, 2015. (4 RT 680.) The prosecutor played a video recording of Albert's interview and provided the jury with a transcript of the interview. (4 RT 681; 2 CT 282.) Detective Purcell investigated the gun and gun stock found at 1100 Leslie to determiney whether Albert had sawed the stock off that morning. (4 RT 691-692.) The rifle was a .223 caliber and the stock was a Bell and Carlson. (4 RT 692-693.) The butt stock appeared to match up with the rifle. (4 RT 693.)

44. Albert told Purcell that he had sanded the area where he cut off the stock. (4 RT 698.) Albert initially denied ever seeing the gun, but then said that he previously had a firearm that looked similar, which he had thrown away. (4 RT 699.) Albert claimed to have bought the gun from a man in a park the day he was arrested. (4 RT 699.)

3ORIGINAL

45. Purcell submitted bullet fragments and shell casings to the Department of Justice for analysis. (4 RT 711-712.) Purcell located a brass shell casing in a field at Whittier and Yale which was also sent. (4 RT 713.) In the search of 1100 Leslie, Purcell found a piece of cardboard bearing Albert's name and a phone number. (4 RT 713.) That number matched the number of a cell phone seized from Albert, as well as the number that Hurst received a phone call from. (4 RT 714.)

46. Purcell also interviewed Amanda Rico, Cristoval Valenzuela, and April Rodriguez. (4 RT 715.) Rodriguez had a tattoo that says "Night Owl" over her left eye, and owns a white Ford Explorer. (4 RT 715.)

### d. Gang evidence.

47. On February 19, 2016, Sheriff's deputy Samara Scott was handling inmates coming in and out of court. (3 RT 382.) That day, when she was cleaning cell 12, when she noticed graffiti on the bench in the cell which said, "IE," "Hemet," and "SSC." (3 RT 383, 385.) Albert and petitioner had been inmates in cell 12. (3 RT 385.) Scott noticed the graffiti around 5:30 and 5:45 pm, at which time all the inmates had been taken to the buses. (3 RT 386.) Petitioner and Albert were placed in the cell between 1:00 and 1:30 p.m. (3 RT 386.) A total of 6 persons had been placed in cell 12 from about 1:00 until they departed between 5:30 and 5:45. (3 RT 388.)

48. Investigator Klinzing described a Field Interview Card as a record used to document, gather and collect information relating to individuals and gangs. (3 RT 508.) Klinzing filled out an FI card for petitioner on May 5, 2012 on West Oakland Avenue. (3 RT 509, 512.) On that date, Klinzing determined that petitioner was "affiliated with" SSC. (3 RT 511.) Petitioner had "Southern" tattooed on his right arm and "California" on his left arm. (3 RT 512.)

49. On April 17, 2015, Officer Ian Bailey contacted Albert at 300 East Johnson Avenue. (4 RT 577.) Albert had an SSC tattoo on his head, as well as a tattoo of the letter "S" on each wrist, and "Ramirez" on his chest. (4 RT 577-578.) Bailey again contacted Albert on April 24, 2015 in the driveway at 1100 Leslie Drive. (4 RT 578.)

Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

50. Detective Brent Christianson contacted Albert on February 21, 2009. (4 RT 581.) Christianson identified additional tattoos – "HMT" on Albert's back, as well as numerous "IE" tattoos. (4 RT 582.) Albert stated that his moniker was "Downer." (4 RT 582.)

51. Highway Patrolman Scott Beauchane was working with the Hemet Gang Task force when he contacted petitioner on July 5, 2012. (4 RT 584.) Petitioner had a tattoo that said, "Southern California" on his forearms, "Ramirez" on his shoulder, and three dots on his right wrist. (4 RT 585.) Petitioner stated that he was associated with South Side Criminals ("SSC") and that his moniker was "Happy". (4 RT 585.) At that time, petitioner had been an SSC member for two years and had been "jumped in" at a park in Hemet. (4 RT 586.) Petitioner voluntarily came into the police station to speak with Beauchane, and was wearing a Lakers hat which had no gang relation. (4 RT 587-588.)

52. David Cortright is a US Border Patrol Agent who was assigned to the Riverside County Gang Task Force in 2014. (4 RT 590.) On June 5, 2014, he spoke with petitioner in the lobby of the Hemet Police Department. (4 RT 590.) Cortright noted the following additional tattoos: "Ramirez" on petitioner's upper right chest; and a capital "H" on his right shoulder; "Darlene" on his right arm; three dots and "IE" on his right hand; a skeleton wearing a sombrero drinking alcohol on his left arm; and "Josie" on his left arm. (4 RT 591.)

53. Cortright described the gang meaning of these tattoos, which generally involved gangs in Hemet, and the Sureño gang. (4 RT 592.) Petitioner stated that he was a member of SSC. (4 RT 592.) Petitioner had associated with the gang since he was 13, and was jumped in at 17. (4 RT 593.)

54. Petitioner told Cortright that he had not associated with SSC members since 2013, when he was released from jail. (4 RT 594.) Petitioner was wearing a green polo shirt with black pants and dress shoes when he met Cortright. (4 RT 594.)

55. On January 17, 2018, Sheriff's deputy Feng Vang searched petitioner's shared jail cell. is a Sheriff's deputy working at the Presley detention center in the Gang Investigations Unit. (4 RT 599.), at 3:00 pm, he (4 RT 599.) Vang had never been in the cell or seen any damage to

Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

the cell before the search. (4 RT 600.) Vang saw some graffiti, which included the letters "SSC" and "Hemet Crazy Ones." (4 RT 601.) Inside of a cardboard box, the word "Hemet" was written. (4 RT 603.) There was also a drawing of a happy face, and "three dots and two lines." (4 RT 604.) In the corner of the drawing, was the name "Big Mo." (4 RT 606.) Vang didn't investigate to see if there was anyone in the jail who went by the name "Big Mo." (4 RT 607.) Vang stated that the line and dot drawing was a common symbol in Hispanic gang culture. (4 RT 605.)

56. Vang didn't determine whether there were other SSC associates in petitioner's part of the jail. (4 RT 606.) Vang didn't know if the graffiti had previously been documented by any other deputies. (4 RT 609.) Vang didn't see petitioner write any of the letters in the cell and didn't know how long they had been there. (4 RT 610-612.)

57. Investigator David Hankins works in the Gang Impact Team. (4 RT 718.) Gang members look down on "snitches" who report crimes and will retaliate with violence against snitches. (4 RT 728-729.) Hankins stated that it was common for gang members to dissuade witnesses from testifying. (4 RT 729.) It is common for witnesses not to testify in gang cases. (4 RT 733.)

58. A person can be in protective custody in jail to protect the inmate's safety as well as that of the staff. (4 RT 731.) Gang dropouts are often in PC. (4 RT 731.) Anytime a gang member is near a PC inmate, they are required to "hit 'em." (4 RT 732.)

59. Hankins said that in April of 2015, there were approximately 100 documented members of SSC, but there are often members who are not documented by law enforcement. (4 RT 736-737.) Hankins described the following symbols for SSC: the letters "SSC"; "Sick Side Criminals;" the abbreviation "HMT;" Hemet Crazy Ones or "HCO;" Inland Empire, Insane Empire or "IE;" the number 13; and the color blue. (4 RT 738.) Members also wear Dallas Cowboys attire or a Houston Astros "H" hat. (4 RT 738.) Hankins had personally investigated over 50 violent crimes involving SSC members. (4 RT 739.) SSC does not have specific turf, but is spread over the entire city of Hemet. (4 RT 739.)

p-12
Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

60. Hankins identified SSC related graffiti and the monikers "Downer" and "Happs" which he opined is short for "Happy". (4 RT 740-741; Exh. 123.) Hankins also identified SSC graffiti in the street, ostensibly created by "Joker" and "Nasty." (4 RT 741; Exh. 125, 126.) Finally, Hankins identified SSC related graffiti on a wall in Hemet, made by a member named "Hoodlum." (4 RT 742-743; Exh. 129.)

61. Hankins identified a photograph wherein persons were making an "SSC" hand sign. (4 RT 743, Exh. 118.) In that photo a man is making an "IE" hand sign. (4 RT 744.) Finally, another photo showed an individual making an "H" hand sign and another making a 13 hand sign while holding a firearm. (4 RT 744-745.)

62. Hankins opined that on April 21, 2015, SSC was an ongoing criminal organization with three or more members. (4 RT 745.) Hankins testified about a predicate involving an SSC member named Richard Natartes who was convicted of robbery on October 14, 2015 and a violation of Penal Code section 29800(a)(1) on April 8, 2014. (4 RT 745-748; Exhs. 132, 134.) Hankins also testified about a predicate involving an SSC member named Francisco Ibarra, also known as "Bullet," who was convicted of VC 10521 on April 8, 2014. (4 RT 747-748; Exh. 133.) Hankins identified photographs of female SSC member Jessica Roberson, aka "Little Dreamer," who was convicted of possession of a controlled substance for sale on March 6, 2015. (4 RT 748-750; Exhs. 135, 138.)

63. Hankins identified a "very distinct" SSC tattoo on the top of Albert's head; a large "HMT" tattoo on his back; the letters "IE" on his shoulders; and his name on his torso. (4 RT 751-752.) The large gang tattoo on Albert's head represented a "high level of commitment" to the gang. (4 RT 753.) Hankins also identified an "Aztec-type" tattoo on Albert's upper arm which is "very common in southern Hispanic gang culture." (4 RT 755.) Another Aztec style tattoo showed a demon eating a catholic priest. (4 RT 755.) Albert had an "S" tattoo on each arm, which stands for "Southsider." (4 RT 756.) Albert also had a tattoo of "IE" on his leg and a skull with an "H" on his arm. (4 RT 756-757.)

64. Hankins opined that Albert was an SSC member based on his tattoos, the areas that

p-13
Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

he frequents, the people he associates with and because "the type of crime this case involves is consistent with Southside Criminal activities." (4 RT 757.) Albert's head tattoo showed that he was proud of his gang membership, and that he used it "almost as a billboard for the gang." (4 RT 758.)

65. Hankins prepared three "FI" (field identification) cards for petitioner. (4 RT 758.) On April 25, 2008, Hankins spoke with petitioner who stated that he was a Sureño and that he attended Tahquitz High School. (4 RT 759-760.) Hankins also met with petitioner on March 15, 2012, when he identified as a member of "Hemet Trece." (4 RT 760-761.) Petitioner was with his cousin Anthony Ventura who is a member of "La Raza" known as "Danger." (4 RT 761.) On April 10, 2015, Hankins met petitioner, who stated that he was a member of SSC. (4 RT 762.) Hankins advised petitioner that law enforcement believed SSC was a street gang and warned him against committing criminal activities. (4 RT 763.) The advisement, signed by petitioner, stated that if he committed a violation of section 136.1, it could result in a gang enhancement. (4 RT 764.)

66. Hankins identified the following tattoos on petitioner: Ramirez on his right shoulder; the letter "H" on his right shoulder; The roman numeral "X" and "3" on his right arm; "Southern California" on his forearms; "HCO" near his thumb; and "HMT" on his fingers. (4 RT 764-766.)

67. Hankins also identified the jail cell graffiti as gang related. (4 RT 766-767.) Hankins noted that clowns are used in gang culture and are symbolic of the good and bad times of being a gang member. (4 RT 767.) Hankins opined that the graffiti was drawn by Big Mo. (4 RT 767.)

68. Hankins opined that petitioner was a gang member on April 21, 2015 and at the time of trial. (4 RT 769-770.) Posed with a hypothetical similar to the crimes alleged against Alexander, Hankins opined that such a crime would be in association with and for the benefit of a gang. (4 RT 770.) Hankins opined that Albert's purported comment to Hurst that he would kill him would be for the benefit of the gang because it would encourage the witness to remain silent. (4 RT 771.) Hankins opined that petitioner's purported comment to Hurst was for the

3ORIGINAL

benefit of the gang because it "eliminated a witness." (4 RT 771.)

69. It is common for a southern California gang member to have a shaved head and wear the color blue. (4 RT 776.) Hankins knew "Whisper" to have been a member of SSC. (4 RT 778.) Hankins agreed that a shooting after a confrontation between two drivers would not necessarily be gang related. (4 RT 782.)

### e. Evidence related to Albert's firearm.

70. Officer Chris Pedersen is a police officer with the City of Riverside who worked as a probation officer in Riverside County in 2015. (3 RT 432.) Pedersen worked with the Gang Task Force in Hemet and served a search warrant at 1100 Leslie on April 24, 2015. (3 RT 433.) Pedersen located a firearm wrapped in blanket inside a closet of the house. (3 RT 435.)

71. Darlene Ramirez, Albert's sister, testified that she had memory issues with respect to most of the prosecution's questions and as to the contents of her prior interview with police. Darlene had formerly resided at 1100 Leslie in Hemet. (2 RT 297.) Her brother, Albert, would visit her at that address. (2 RT 298.) Darlene had previously seen Albert be picked up in a white Ford SUV. (2 RT 299, 301.) On April 21, 2015, Darlene saw a Facebook post about a shooting involving a white SUV and texted Albert that he should not be driving his SUV around. (2 RT 300.)

72. The day after the shooting Albert went to Darlene's house and was acting weird because he was on drugs. (2 RT 306.) Darlene could not remember telling police that Albert was paranoid, and was rummaging through the closet at her house. (2 RT 307.) Darlene testified that she could not remember her recorded statement. (2 RT 308.)

73. Darlene identified a photograph of a firearm, and testified that she had never seen the gun before the police showed her the photo. (2 RT 311-312.) Darlene was worried that her kids would be taken away because there was a gun in her house. (2 RT 312.)

74. The prosecutor played portions of the recording of Purcell's interview of Darlene for the jury. (4 RT 702; 2 CT 387.) Darlene told Purcell that she had seen Albert in a white SUV with another man. (4 RT 702.) She also told Purcell that she had seen Albert going through the

p-15
Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

1   closet on Thursday, April 23. (4 RT 703.) When confronted with the fact that officers found a

2   firearm in her closet, Darlene became very emotional and stated that she didn't know that it was

3   there. (4 RT 704.)

4        75. Luis Navarro is the father of Darlene's children. (2 RT 327-328.) Navarro was shown

5   a photo of the gun, and stated that the gun didn't belong to him. (2 RT 330.) Navarro didn't

6   remember his interview with police because he was on drugs at that time. (2 RT 331.) Navarro

7   got very upset when police told him there was a gun on the ground in the house where his

8   children lived. (2 RT 332-333.) Navarro denied saying that he had seen Albert with the gun a

9   few weeks earlier. (2 RT 334.) Navarro denied making a number of different statements to

10  police regarding the firearm and the SUV. Navarro denied being afraid of Albert and denied any

11  knowledge of Albert's gang affiliation. (2 RT 336.) Navarro denied ever having seen petitioner.

12  (2 RT 340.)

13       76. Inspector Klinzing met with Navarro to discuss the gun that was found at 1100 Leslie.

14  (3 RT 522.) The prosecutor played a recording from that interview and provided the jury with

15  copies of the transcript. (3 RT 523; 2 CT 399.) Navarro acknowledged that he had seen Albert

16  with the firearm found in the closet. (3 RT 525.) Navarro also confirmed that he had seen Albert

17  in a white Ford Explorer. (3 RT 525.) Klinzing showed Navarro a photo of petitioner, and

18  Navarro stated that he had seen petitioner with Albert in the Explorer. (3 RT 526.) When

19  showing Navarro a photograph of the firearm found at 1100 Leslie, Klinzing told Navarro that

20  the gun "can be a problem for both Darlene and for you." (3 RT 533.) Subsequently, Navarro

21  stated that he had seen Albert with the gun. (3 RT 533.)

22       77. Vicente Guerrero is a latent print analyst with the California Department of Justice.

23  (3 RT 444.) Guerrero analyzed a .223 caliber rifle with a sawed off barrel for fingerprints. (3

24  RT 450.) Guerrero located three latent prints on the firearm. (3 RT 451.) One of the latent

25  prints matched Albert's palm print. (3 RT 458.) There was no match to petitioner. (3 RT 460.)

26       78. Richard Takenaga is a retired forensic firearms examiner with the Department of

27  Justice. (3 RT 473.) Takenaga received a gun, unfired ammunition, an expended cartridge case,

28

p-16
Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

and several bullet fragments from Detective Purcell, related to this case. (3 RT 483.) The gun was a .223 caliber Remington bolt action rifle. (3 RT 490.)

79. Takenaga performed several test fires to compare the shells and projectiles to the samples that he received. (3 RT 489-490.) Takenaga opined that the .223 caliber rifle he tested fired the cartridge cases in evidence. (3 RT 492.) Takenaga confirmed that one of the bullet fragments was fired from the rifle. (3 RT 495.) Takenaga opined that a shotgun could not have fired the bullet fragment he tested. (3 RT 497.)

90. Brian Reinarz was a firearms analyst at the California Department of Justice. (4 RT 565.) Reinarz reviewed Takenaga's analysis of the rifle. (4 RT 568.) Reinarz agreed with Takenaga's opinion that the cartridge case from the test fire matched the sample provided. (4 RT 571.) He also agreed with Takenaga's opinion that the projectile from the test fire matched the bullet fragment and both were fired from the same gun. (4 RT 571-572.)

### f. Petitioner's firearm possession.

91. Detective Matthew Gomez conducted a traffic stop on April 25, 2015, at approximately 3:00 am in the city of Hemet. (3 RT 464.) Petitioner was in the passenger seat of the car. (3 RT 465.) There was a blue bandana in the front compartment of the car and a shotgun under the passenger seat. (3 RT 467.) There was a spent shell inside the shotgun, and shells in the side of the door. (3 RT 467-468.) Gomez didn't test fire the shotgun found in the car. (3 RT 471.) The shells located in the car were .20 gauge, and filled with small pellets. (3 RT 471.) Another person was driving the car while petitioner was in the passenger seat. (3 RT 471.)

92. The parties stipulated that petitioner had previously been convicted of a felony. (4 RT 787.)

### 3. Claims for relief.

93. Petitioner was denied his Fourteenth Amendment right to due process when the trial court refused to sever his trial from co-defendant Albert Ramirez, who was charged with the much more serious additional crimes murder and attempted murder, charges not filed against petitioner.

p-17
Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

94. Petitioner was denied his Fourteenth Amendment right to due process when he was convicted of dissuading a witness based on constitutionally insufficient evidence.

95. Petitioner was denied his Fourteenth Amendment right to due process when he was convicted of dissuading a witness under section 136.1, when the only witness that evidence suggested petitioner may have dissuaded was an accomplice to the crime about which the witness could testify about.

96. Petitioner was denied his Fourteenth Amendment right to due process when there was constitutionally insufficient evidence that petitioner aided and abetted Albert in dissuading a witness.

### 4. Prayer for relief.

Wherefore, Petitioner prays that this court issue a writ of habeas corpus.

Dated: Oakland, California, Wednesday, January 12, 2022.

s/ Robert J. Beles
_____
Robert J. Beles
Attorney for Petitioner.

### VERIFICATION

Petitioner is in custody and incarcerated outside of Alameda County. I therefore verify the petition on his behalf. I declare under penalty of perjury that the facts set forth in this petition are true and correct based on my review of the record and the attached Exhibits A and B are true and correct copies of the corresponding United States Supreme Court orders. Executed in Oakland, California, on Wednesday, January 12, 2022.

s/ Robert J. Beles
_____
Robert J. Beles
Attorney for Petitioner.

Petition for Writ of Habeas Corpus; Verification;
Memorandum of Points and Authorities; Exhibits "A" and "B"

3ORIGINAL

## United States District Court
### Central District of California
--- Courthouse

|  |  |
|---|---|
| Ricardo Jesus Ramirez,<br><br>                    *Petitioner*,<br>        vs.<br><br>Warren L. Montgomery, Warden,<br>Calipatria State Prison, Calipatria,<br>California,,<br><br>                    *Respondent*.<br><br>People of the State of California,<br><br>                    *Real Party in Interest*. | No. 5:22-cv-00083<br><br>MEMORANDUM OF POINTS AND AUTHORITIES |

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1. Introduction.

Relief by way of a petition of writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or law or treaties of the United States. 28 U.S.C. section 2254(a); 28 U.S.C. section 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.

The challenged convictions arise out of the Riverside County Superior Court, which is located within the Central District of California. Section 2254(a); 28 U.S.C. section 2241(d).

### 2. Petitioner was denied his Fourteenth Amendment right to due process when the trial court refused to sever his trial from co-defendant Albert Ramirez, who was charged with the much more serious additional crimes murder and attempted murder, charges not filed against petitioner.

### a. Introduction.

Penal Code section 1098 allows for the joint trial of defendants in a criminal case. However, section 1098 also recognizes a trial court's discretion to order separate trials as to one or more defendants. A preference for joint trials "must be subordinated when they run counter to the need to insure fair trials and to protect fundamental constitutional rights." *People v.*

3ORIGINAL

*Aranda* (1965) 63 Cal.2d 518, 530 n.9."[T]he pursuit of judicial economy and efficiency may never be used to deny a defendant his right to a fair trial." *Williams v. Superior Court* (1984) 36 Cal.3d 441, 451-452.

Misjoinder of defendants may deny a defendant his Fourteenth Amendment right to due process. *Smith v. Kelso,* 863 F.2d 1564 (11th Cir. 1989); *United States v. Tootick,* 952 F.2d 1078 (9th Cir. 1991); *Abbott v. Wainwright,* 616 F.2d 889 (5th Cir. 1980); *Bird v. Wainwright,* 428 F.2d 1017 (5th Cir. 1970).

In the state Court of Appeal, petitioner argued that trial court erred in denying his motion to sever because: 1) the prosecution was allowed to join a weak case, the one against petitioner, with a strong case, the one against Albert; 2) because of the danger of prejudicial association with Albert, who was charged with far more serious crimes than petitioner; and 3) because the resulting prejudice from the joint trial denied petitioner his right to due process. The Court of Appeal disagreed, finding that the charges in common between petitioner and Albert allowed for a joint trial. (Appendix at pp. 18-24.)

**b. The joint trial resulted in the joinder of a weak case with a strong case, which induced the jury to convict petitioner because of prejudicial association with Albert.**

Under California law, cases should be severed where there is a danger that the defendant will be convicted by association with his codefendant, rather than on the merits of the case against him. *People v. Chambers* (1964) 231 Cal.App.2d 23, 28; *People v. Massie* (1967) 66 Cal.2d 899 at p. 916; *People v. Biehler* (1961) 198 Cal.App.2d 290 at p. 298. A conviction based on guilt by association, as opposed to personal guilt, denies a defendant his right to due process. *People v. Chambers*, 231 Cal.App. at p. 28.

In *Calderon v. Superior Court* (2001) 87 Cal.App.4th 933, 939, the court of appeal held that a reviewing court should weigh the following factors in determining whether defendants were properly joined:

(1) whether evidence of the crimes would be cross-admissible;

3ORIGINAL

(2) whether some charges are likely to inflame the jury against the defendant;

(3) whether a weak case has been joined with a strong one; and

(4) whether any of the charges is potentially a capital offense.

Albert was charged with shooting and killing John Moreno and leaving him dead in the street. The prosecution's theory was that Albert killed Moreno because he had left the SSC gang. The jury also heard about Albert shooting Alexander, totally unprovoked, just a few hours after the Moreno shooting. It is hard to imagine more inflammatory charges than murder and attempted murder of unarmed persons. Compared to *Calderon v. Superior Court* where the defendant challenging the joinder was also charged with murder, the inflammatory nature of Albert's charges when compared to petitioner's charge of dissuading a witness is more prejudicial.

Moreover, the joinder of Albert and petitioner resulted in joining a weak case – the case against petitioner – with a strong case – the case against Albert. *Calderon v. Superior Court*, 87 Cal.App.4th at p. 941. Joinder of a weak case with a strong case, even cases involving the same defendant, can similarly violate fourteenth Amendment due process by depriving the defendant of a fundamentally fair trial. *Bean v. Calderon*, 163 F.3d 1073, 1083-1084 (9th Cir. 1998), citing *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986.)

The weight of the evidence regarding the alleged crimes was against Albert. Only two witnesses testified as to Counts 4 and 6 against petitioner. In contrast, 14 witnesses testified about the murder, attempted murder, and firearm possession alleged against Albert. Moreover, Alexander, in his preliminary hearing testimony, stated that Albert was handed a gun and fired it directly at Alexander without provocation. The independent evidence of Albert's guilt, at least with respect to the Alexander incident was strong.

The strength of the prosecution's case against Albert was further bolstered by Albert's own words in his statement to Detective Purcell. (2 CT 282-384.) That statement included an implied admission for both crimes. The following occurred after Detective Purcell stated that Albert's mother was going to lose another son to custody:

3ORIGINAL

| | | |
|---|---|---|
| 1 | **Albert Ramirez:** | "She's gonna lose another one huh? Already – we already knew that was coming, like, you know what I mean? She already knew." |
| 2 | | |
| 3 | **Detective Purcell:** | "It didn't have to be like that.' |
| 4 | **Albert Ramirez:** | "I – I mean shit turned out the way it did, like you know what I mean? And I can't change it myself, you know what I mean." |
| 5 | | |
| 6 | **Detective Purcell:** | "Well you're the only one that can change yourself." |
| 7 | **Albert Ramirez:** | "I mean I can change myself. You know what I mean? I can. But I can't change the situation of what it is, you know what I mean?" |
| 8 | | |
| 9 | **Detective Purcell:** | "Yeah, well if you could change – if you could change something about Monday night, what would you change? What would – what would you do different?" |
| 10 | | |
| 11 | **Albert Ramirez:** | "Man, fucking I'd do everything different. I'd stay at home, fucking kick it with my lady. Like kick it with Christine, all night." |
| 12 | (2 CT 377.) | |

In addition to the other evidence against Albert, the prosecution also had a highly incriminating statement, in which Albert impliedly admitted his participation in the shootings. The case against Albert was very strong.

The case against petitioner, on the other hand, consisted only of Hurst's inconsistent statements about petitioner's alleged threats to him in the white Explorer. Hurst had multiple felony convictions involving moral turpitude and was in custody when he testified. (2 RT 249-250.) Hurst admitted that he smoked methamphetamine immediately before the shooting and had not slept for at least 15 hours before he initially spoke to police and alleged that petitioner had attempted to dissuade him from reporting the crime. Hurst didn't come forward with information regarding the shooting until after police accused him of stealing his aunt's television set. Hurst lied repeatedly in his statement to the police, denying that he smoked methamphetamine in the car, in contrast to his trial testimony. (2 RT 241.) Finally, though he refused to regard himself as a drug dealer, he sold illicit drugs from his Facebook account. (2 RT 275-277.)

Hurst was wildly inconsistent with respect to what petitioner said to "dissuade" him, and

3ORIGINAL

1   even whether petitioner ever made any statement to him at all. In the light most favorable to the

2   jury's verdict, Hurst's testimony was that petitioner said that Albert was the type of person who

3   would kill someone if they went to the police. (2 RT 219.) However, at the preliminary hearing,

4   Hurst didn't remember petitioner "saying anything in particular." (2 RT 267.)

5           Moreover, there was a serious question as to whether the one possible phrase attributed

6   to petitioner was even legally sufficient to render him liable for a violation of section 136.1. (See

7   discussion below.)

8           Overall, the case against petitioner was very weak. The danger of guilt by association was

9   exacerbated by the numerous witnesses who refused to testify about Albert's crimes. Paul

10  Alexander claimed memory loss to the point that his preliminary hearing transcript testimony

11  had to be read to the jury. Moreover, Amanda Rico (2 RT 215) and Cristoval Valenzuela (2 RT

12  367), both of who were witnesses to the crimes alleged against Albert, refused to testify. Worse

13  yet, members of Albert's own family – Darlene and Navarro – both were evasive in answering

14  questions suggesting that they too were afraid of Albert. This, combined with the inflammatory

15  nature of the charges against Albert but not petitioner, further increased the danger of guilty by

16  association.

17          The court of appeal found that the strength of the cases against petitioner and Albert

18  were "roughly equivalent." (Opinion at p. 22.) The court found that the evidence against both

19  defendants was "essentially the same," and that Hurst's testimony was "corroborated by Paul."

20  (Opinion at p. 22.) But petitioner was not convicted of any offense against Paul. Paul didn't

21  corroborate any of Hurst's testimony about what took place inside the car *after* Albert shot Paul,

22  because he was not present in the car. The court of appeal's opinion suffers from the very

23  problem that petitioner alleges is innate in this case – that the jury would use the evidence

24  against Albert to convict petitioner. Where the court of appeal is unable to differentiate the

25  evidence against the two, how could a reasonable juror properly compartmentalize the issues?

26

27

28

3ORIGINAL

### c. The joinder resulted in the admission of highly prejudicial, otherwise inadmissible evidence against petitioner in violation of his Fourteenth Amendment right to due process.

In *People v. Chambers* , the court noted that had the defendant been tried alone, certain evidence admitted against him would have been plainly inadmissible, and was admitted "only because the defendants were tried together." *People v. Chambers*, 231 Cal.App.2d at p. 31. The court found that because several of the offenses charged against his co-defendant were "utterly disconnected" from the assaults charged against Chambers, the consolidation of cases was "highly objectionable." (*Id*. at p. 32.)

In *Calderon v. Superior Court*, 87 Cal.App.4th at p. 490-491, the prosecution sought to admit extensive gang evidence to establish the existence of a "Mara Salvatrucha" gang, and Calderon's participation in that gang. Calderon offered to stipulate to the existence of the gang as a criminal street gang. The court found that the application of the criminal street gang statute as it related to the joined case "is likely to undermine the effect of any stipulation" with respect to Calderon and that "jurors would be remarkable indeed to avoid improperly allocating responsibility for those crimes to Calderon." *Calderon v. Superior Court*, 87 Cal.App.4th at 941.

Before trial and after the motion to sever was denied, petitioner stated his intention to plead guilty to Count 6 to prevent the jury from learning that he had previously been convicted of a felony and was in possession of a firearm. (1 RT 25.) The purpose of pleading was to prevent the jury from hearing about any prior offense, as the court had already excluded one of the prosecution's proposed predicate offenses which related to petitioner's prior conviction. (1 RT 28.) Naturally, petitioner wanted to prevent the jury to use the prior convictions as propensity evidence. (The trial on petitioner's prior conviction enhancements was bifurcated.)

However, the prosecution argued that even if petitioner pled guilty, the jury would still be entitled to hear about petitioner's arrest for unlawful possession of a firearm because Albert could argue that the firearm seized from petitioner was in fact the gun used in the shootings. (1 RT 96.) Counsel for Albert confirmed that his intent was to argue that the firearm in petitioner's

3ORIGINAL

possession was the one used in the shootings. (1 RT 98.) Accordingly, the trial court held that even if petitioner pled guilty to Count 6, evidence of his unlawful possession would still be presented to the jury.

In *People v. Reeder* (1978) 82 Cal.App.3d 543, 555, the court found that severance was appropriate and held that where one defendant wanted to admit prejudicial exculpatory evidence which was inadmissible against his co-defendant, it was improper for the court to deny the defendant his right to present evidence. However, the court noted that once the evidence was admitted, the co-defendant had the right to move for a mistrial or separate trial if he could not get a fair trial. (*Id*. at p. 555.)

Albert had a Sixth Amendment right to present a defense and evidence in his favor. Albert was entitled to argue, in spite of substantial evidence to the contrary, that the gun seized from petitioner was the one used in the shootings.

Had the trials been severed, the jury would never have heard about petitioner's unlawful firearm possession in Count 6. Trial could have been bifurcated or the charge admitted. This count was extremely prejudicial to petitioner. First, it suggested a criminal propensity as it revealed petitioner's prior felony conviction to the jury. Second, the possession count suggested to the jury that petitioner was dangerous and violent as he was arrested in a car with a sawed-off shotgun under his seat. Again, severance would have prevented this prejudicial and inadmissible propensity evidence from being presented to the jury.

Where defendants have antagonistic defenses, their trials should be severed. *United States v. Angwin,* 271 F.3d 786, 795 (9th Cir. 2001), *United States v. Tootick*, 952 F.2d at 1081, *People v. Massie*, 66 Cal.2d at p. 916.

The denial of the motion to sever also resulted in the jury hearing evidence that petitioner had reported to the police station involuntarily. (4 RT 594.) Counsel moved for a mistrial based on Officer Cortright's "gratuitous" and unsolicited comments that petitioner had just been released from custody and was involuntarily required to report to the sheriff's department. (4 RT 613-614.) The prosecutor agreed that Cortright's statement was inappropriate, but opposed

3ORIGINAL

a mistrial. (4 RT 615.) The court denied the motion, finding that petitioner was not prejudiced by Cortright's comment because the jury would hear that petitioner was a convicted felon related to Count 6. (4 RT 615-616.)

Had petitioner's trial been severed from Albert's, the jury would never have heard about petitioner's prior conviction because he would have pled guilty to the felon in possession charge. Therefore, had petitioner's case been severed from Albert's, the prejudice of Cortright's gratuitous and inappropriate comments would have required a mistrial. Once again, the failure to sever petitioner's case from Albert severely affected petitioner's right to a fair trial, free from inadmissible and highly prejudicial evidence.

Failure to sever petitioner's and Albert's trial deprived petitioner of a fair trial through association with Albert, and thus denied him his Fourteenth Amendment right to due process.

### 3. Petitioner was denied his Fourteenth Amendment right to due process when he was convicted of dissuading a witness based on constitutionally insufficient evidence.

#### a. Introduction.

A conviction based on insufficient evidence violates federal due process. *Jackson v. Virginia* (1979) 443 U.S. 307. In reviewing a claim of sufficiency of the evidence, the court must view the evidence in the light most favorable to the prosecution, and if any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 319, citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)

The primary charge against petitioner was that he dissuaded Adam Hurst from reporting the Alexander shooting. Hurst testified that after asking if he was "cool," Albert threatened to kill him if he reported the shooting to the police. Hurst's trial testimony, preliminary hearing testimony, and statement to police didn't present a consistent account of what petitioner said next. According to Hurst, petitioner said something to the effect that Albert was the type of person to kill someone if they spoke to the police.

In the state court of appeal, petitioner presented three distinct arguments that there was insufficient evidence that he committed the crime of dissuading a witness: 1) the evidence was

3ORIGINAL

insufficient to show that he threatened Hurst to prevent him from reporting Albert's crime; 2) petitioner could not be guilty of dissuading Hurst because Hurst was an accomplice to the crime; and 3) petitioner could not have been guilty of aiding and abetting Albert's completed crime of dissuading Hurst. The court of appeal only analyzed the first claim.

### b. There was insufficient evidence that petitioner dissuaded or attempted to dissuade Hurst from being a witness to a crime.

CALCRIM 2622 set out the elements of dissuading a witness in violation of section 136.1:

"To prove that a defendant is guilty of this crime, the people must prove that:

> 1. A defendant maliciously tried to prevent or discourage Adam Hurst from making a report that someone else was a victim of a crime to law enforcement.

> 2. Adam Hurst was a witness;

AND

> 3. A defendant knew he was trying to prevent or discourage Adam Hurst from making a report that someone else was a crime victim and intended to do so.

A person acts maliciously when he or she intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice."

(2 CT 519.)

Dissuading a witness is a specific intent crime. *People v. Jones* (1998) 67 Cal.App.4th 724. "Penal Code section 136.1, subdivision (c)(1), proscribes one from (among other things) using a threat of violence in an attempt to dissuade a witness from testifying. Unless the actions or statements are meant to achieve the consequence of affecting a potential witness' testimony, no crime has been committed." *People v. Ford* (1983) 145 Cal.App.3d 985, 989.

In *People v. Ford*, 145 Cal.App.3d at p. 989, the court analyzed the following statement relative to a prosecution for dissuading a witness: "You punk mother fucker, we'll get you, you've got kids." The *Ford* court noted that there were two possible interpretations of this statement. First, the statement could mean, "You did this to me and you will pay for it," at which point the intent to dissuade would not be established and no crime would have been

3ORIGINAL

committed. *People v. Ford*, 145 Cal.App.3d at 990. Alternatively, the statement could be interpreted to mean, "You did this to me and if you do it again you will pay. You better not testify in the future or we'll get your kids." *Id*. at 990. *Ford* noted that the distinction between the interpretations was the defendant's intent to "achieve some additional consequence" – preventing the witness from testifying.

The jury presumably found that Hurst was credible and that petitioner stated, "If [Albert] thinks someone is going to go to the cops, that he'll kill em." (2 RT 219.) Unlike in *Ford*, there are not two interpretations of this statement. Petitioner's statement could be interpreted as a warning to Hurst, that Albert really would act on his threat to kill Hurst if Hurst spoke to the police. The intent of this statement would not be to dissuade Hurst from going to the police, but to prevent Hurst from being killed by Albert, who petitioner had just witnessed shoot another driver with no provocation. Such a conclusion is the only reasonable interpretation of the evidence presented to the jury.

The evidence didn't show that petitioner "maliciously" tried to prevent Hurst from reporting the Alexander attempted murder. Petitioner had no personal interest in preventing the reporting of the crime because he was not liable for the crime. The evidence showed that petitioner didn't want anyone to be hurt or killed on April 21, 2015, as he instructed Albert not to shoot Alexander. The only evidence suggesting that petitioner harbored the requisite criminal intent were his prior police contacts and gang affiliation. However, because that evidence was only relevant for improper propensity, rather than to the elements of the charged crimes, petitioner's record could not have been used to support his conviction. Where petitioner's statement could be interpreted as an attempt to aid or abet Albert in dissuading Hurst, that conclusion presents an entirely separate sufficiency issue.

There was no evidence that petitioner intended that his statement to Hurst dissuade him from reporting Albert's crime. Literally, the statement was merely warning Hurst so that Hurst would not be killed. Petitioner's conviction thus violated his Fourteenth Amendment right to due process. *Jackson v. Virginia*, 443 U.S. at 319.

3ORIGINAL

**4. Petitioner was denied his Fourteenth Amendment right to due process when he was convicted of dissuading a witness under section 136.1, when the only witness that evidence suggested petitioner may have dissuaded was an accomplice to the crime about which the witness could testify.**

The jury was instructed, pursuant to section 136.1, that a witness is a person who "knows about the existence or nonexistence of facts relating to a crime." (5 RT 844, 2 CT 519, see Penal Code section 136(2).) Neither section 136.1 nor the jury instructions make any distinction between witnesses and accomplices. However, logically speaking, under the circumstances of his case, a non-accomplice cannot dissuade an accomplice from reporting a crime.

Hurst was an accomplice to the attempted murder of Alexander. Alexander testified that a man sitting in the back seat of the white Explorer passed a firearm to the driver, who then shot Alexander. Hurst testified at the time of the shooting that he was in the back seat of the vehicle with a female. (1 RT 165.) Accordingly, the court instructed the jury regarding accomplice corroboration of Hurst pursuant to CALCRIM 334. (5 RT 882.)

In contrast, petitioner wasn't charged as an accomplice to the attempted murder of Alexander because he wasn't one. Petitioner didn't aid or encourage Albert to shoot Alexander. Rather, he told Albert not to kill Alexander. (2 RT 263.) He didn't provide any physical or material aid to Albert in shooting Alexander.

Section 136.1 prevents a person from maliciously preventing a witness from causing the arrest or prosecution relating to a criminal offense. It defies logic to convict petitioner for dissuading Hurst from reporting Hurst's own crime as an aider and abetter of Albert.

The language of section 136.1 shows "a legislative intent to cover the prevention or dissuasion of any witness, victim or nonvictim, from reporting a crime." *People v. Galvez* (2011) 195 Cal.App.4th 1253, 1259. "Dissuading" an accomplice from reporting his own crime goes beyond the legislative purpose of section 136.1. An accomplice does not need anyone to prevent or dissuade them from reporting that crime as the accomplice is naturally reluctant to implicate himself. For example, a defendant need not tell his accomplice "Don't tell anyone about the crime we have committed," because the accomplice will, in the interest of self-preservation, not report his own crime. Unlike a mere witness to a crime, who has no impetus not to report a

m-11

3ORIGINAL

1    crime, an accomplice naturally has an aversion to report his own wrongdoing. Thus, the

2    legislative interest in preventing the suppression of criminal reports is not present where the

3    accomplice is already induced not to report his own wrongdoing.

4        Petitioner was denied his Fourteenth Amendment right to due process when he was

5    convicted of dissuading a witness under section 136.1, when the only witness that evidence

6    suggested petitioner may have dissuaded was an accomplice to the crime about which the witness

7    could testify about.  See *Martinez v. Borg* 937 F.2d 422, 423 (9th Cir. 1991).

8                 **5. Petitioner was denied his Fourteenth Amendment right to due**
     **process when there was constitutionally insufficient evidence that**
9               **petitioner aided and abetted Albert in dissuading a witness.**

10       In the alternative to the theory that petitioner was guilty of dissuading Hurst as a

11   principal, the jury was instructed and the prosecution argued that petitioner was guilty of aiding

12   and abetting Albert in dissuading Hurst. The prosecutor argued to the jury that petitioner "was

13   actually aiding and abetting, facilitating the intent of [Albert], which is to keep Adam Hurst

14   quiet." (5 RT 924.)

15       Aider and abettor liability in California is well established: "[A] person aids and abets the

16   commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of

17   the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the

18   commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the

19   commission of the crime." *People v. Beeman* (1984) 35 Cal.3d 547, 561. *Beeman* error is federal

20   constitutional error because the jury did not have the opportunity to find each element of the

21   crime beyond a reasonable doubt. *Martinez v. Borg*, 937 F.2d at 423.

22       In *People v. Joiner* (2000) 84 Cal.App.4th 946, 967, the Court of Appeal outlined the law

23   regarding the timing of aiding and abetting as related to the completion of a crime:

24       "It is settled that if a defendant's liability for an offense is predicated upon the
         theory that he or she aided and abetted the perpetrator, the defendant's intent to
25       encourage or facilitate the actions of the perpetrator 'must be formed prior to or
         during "commission" of that offense.'" (*People v. Montoya* (1994) 7 Cal. 4th
26       1027, 1039.) However, "it is essential to distinguish the act and intent that
         constitute 'aiding and abetting' the commission of a crime, from conduct that will
27       incur the lesser liability of an 'accessory' to the crime--defined as conduct by one
         who, 'after a felony has been committed, . . . aids a principal in such felony . . .

28
                                              m-12

3ORIGINAL

.'" (*Ibid.*) In this respect, not only must the subjective intent to encourage or facilitate the actions of the perpetrator be formed prior to or during the commission of the offense, if there is no participation in the planning, the aider and abettor must take affirmative action at the time the offense is committed. (1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Introduction to Crimes, § 83, pp. 98-99.)"

In *People v. Joiner*, the court found that there was insufficient evidence that the defendant aided and abetted in the crime of tampering with a Vehicle Identification Number under Vehicle Code section 10802. The court concluded that aider and abettor liability didn't extend to a person who aided in the sale of a vehicle whose VIN had been previously changed. *People v. Joiner,* 84 Cal.App. at p. 968. The *Joiner* court relied on *People v. Cooper* (1991) 53 Cal.3d 1158, 1165-1166, which held that aider and abettor liability for burglary didn't extend to a person who simply aided a burglar in asportation of an object after it had already been removed from "the burgled structure." The *Cooper* court held, "It is legally and logically impossible to both form the requisite intent and in fact, aid, promote, encourage, or facilitate commission of a crime after the commission of that crime has ended." *People v. Cooper*, 53 Cal.3d at p. 1164.

Dissuading a witness under section 136.1 is completed once a defendant takes an "immediate step" towards knowingly and maliciously attempting to persuade a witness from assisting in a prosecution. *People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1519.

The prosecution's theory that petitioner aided and abetted Albert in committing the crime of dissuading a witness was based on petitioner's purported statement that Albert was the type of person to kill someone if they went to the police. That statement was made after Albert spontaneously stated that he would kill Hurst if Hurst told the police about the Alexander shooting. There was no evidence presented that petitioner and Albert planned or discussed dissuading Hurst before Albert made his statement. Accordingly, there was no evidence that petitioner aided, promoted, encouraged or facilitated in the dissuading until after Albert had completed the crime. *People v. Cooper*, 53 Cal.3d at p. 1164.

Because it is impossible to aid or abet a completed crime, there was constitutionally insufficient evidence to convict petitioner of dissuading Hurst under an aiding and abetting theory. *Jackson v. Virginia*, 443 U.S. at 319.

**6. Conclusion.**

For these reasons, this court should issue a writ of habeas corpus.

Dated: Oakland, California, Wednesday, January 12, 2022.




                                        s/ Robert J. Beles
                                        _____
                                        Robert J. Beles
                                        Attorney for Petitioner.